# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

STEPHEN HALL,                          :

     Plaintiff,                    :

                                  Case No. 3:15cv00271

vs.                                    :

                                  District Judge Thomas M. Rose

CAROLYN W. COLVIN,                     :  Chief Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,               :

     Defendant.                    :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

Plaintiff Stephen Hall's last employment was in 2003 when he held an assembly-line job.  On March 5, 2009, he applied for Disability Insurance Benefits and Supplemental Security Income, asserting that he was under a disability due to vertigo, dizzy spells, passing out, an injury to his left ear, bi-polar disorder, depression, high blood pressure, and anxiety attacks.[2]  (Doc. #6, *PageID* # 227).  The Social Security Administration has twice denied his applications based on the conclusion that he is not

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2] The administrative record indicates that Plaintiff's previous application for benefits was denied in July 2005 at the reconsideration stage.  (Doc. #6, *PageID* #115).  It appears that Plaintiff did not seek further review of the July 2005 denial.

under a "disability," as defined by the Social Security Act.

Plaintiff brings the present case challenging the Social Security Administration's second denial of his applications for benefits. The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #13), the administrative record (Docs. #s 6, 7), and the record as a whole.

Plaintiff seeks an Order remanding the case to the Social Security Administration for payment of benefits. The Commissioner seeks an Order affirming its most recnet denial of Plaintiff's applications for benefits.

## II.  Background

### A.  Procedural History

Plaintiff's first round of administrative proceedings culminated with Administrative Law Judge Amelia G. Lombardo's determination that Plaintiff was not under a disability. (Doc. #6, *PageID*#s 44-60).  Plaintiff challenged ALJ Lombardo's decision in this Court (3:12cv00322).

In March 2014, U.S. District Judge Walter H. Rice found that ALJ Lombardo "erred by declining to give controlling or even deferential weight to the opinion of Plaintiffs treating physician, Dr. Martin" and "failed to weigh the opinions of the non-treating, record reviewing physicians by applying the proper evaluative factors in determining how much weight to give those state-agency reviewing physicians, Drs. Diane Manos, M.D. and Elizabeth Das, M.D."  (Doc. #7, *PageID*# 1114).  Judge Rice therefore

2

reversed ALJ Lombardo's decision and remanded the case with directions to the Commissioner to "consider, once again, the medical evidence of record and properly analyze that evidence, both physical and psychological, of the treating physician and non-examining state agency reviewing physicians under the controlling Social Security Regulations.  Such review shall apply the 'good reasons rule,' should the Hearing Officer determine that the opinion of any examining or non-examining, reviewing physician is not entitled to controlling weight."  *Id.* at 1115.

On remand, Plaintiff's case was submitted to ALJ Emily Ruth Statum, who received additional evidence including opinions from treating psychiatrist, Dr. Gainer, *id.* at 1705-08, and consultative examiner, Dr. Smith, *id.* at 1747-590; plus responses to medical interrogatories answered by Dr. Macklin, *id.* at 1762-70.  ALJ Statum also held hearing, during which Plaintiff testified.  *Id.* at 1048-68.

## B.    <u>Plaintiff's Testimony</u>

During a hearing before ALJ Statum, he testified that he was 40 years old and had worked in his last job from December 1995 to November 2003.  He explained that he got sick at work in 2000 and "passed out."  (Doc. #7, *PageID#* 1052).  He fell and hit his head on the ground and shattered a bone in his left ear.  He also explained:

> [E]ver[] since then, I've had dizzy spells, loss of balance which if I turn my head to the left or right, a lot of times I get dizzy spells or loss of balance.  I also have damage to my lower back and my neck which makes it very difficult to sit or stand with my head down or up for a period of time.

*Id*.  Plaintiff further testified, "I have postural orthostatic tachycardia syndrome which can

3

cause me to have lightheadedness, weakness, [and] extreme fatigue. I do pass out on a regular basis. Sometimes without warning." *Id.* at 1052, 1060. He passes "out on a regular basis." *Id.* at 1053. Given the potentially disabling nature of this disorder, it is worth pausing to generally describe its features. According to the National Institute of Neurological Disorders and Stroke:

> Postural orthostatic tachycardia syndrome (POTS) is one of a group of disorders that have orthostatic intolerance (OI) as their primary symptom. OI describes a condition in which an excessively reduced volume of blood returns to the heart after an individual stands up from a lying down position. The primary symptom of OI is lightheadedness or fainting. In POTS, the lightheadedness or fainting is also accompanied by a rapid increase in heartbeat of more than 30 beats per minute, or a heart rate that exceeds 120 beats per minute, within 10 minutes of rising. The faintness or light-headedness of POTS are relieved by lying down again....

http://www.ninds.nih.gov/disorders/postural_tachycardia_syndrome/postural_tachycardia_syndrome.htm[.]

Returning to Plaintiff's hearing, he testified that when he is under physical stress, he gets a rapid heart rate and high blood pressure. He will become very tired and weak, especially when bending over or leaning down, then standing back up. *Id*. at 1055-56. He continued:

> I become very fatigued. I usually will become extremely tired to the point where I fall asleep. I become weak and disoriented. A lot of times I'm not aware of what's going on. I can't stand or walk on my own. I have to be helped to go my bed usually to sleep it off.

*Id*. at 1060. These episodes occur to Plaintiff "a few times a week." *Id*.

Plaintiff also told ALJ Statum that he suffers from emotional issues, including

4

problems with severe depression, flashbacks, anxiety attacks, nightmares, and mood swings.  He is withdrawn,and has suicidal thoughts.  *Id.* at 1053-54.  Plaintiff indicated that he was diagnosed with bi-polar disorder when he was 12 years old and has since become agoraphobic.  *Id.*  He has flashbacks 2-3 times a week, reliving the moment of his mother's death and her funeral.  *Id.* at 1057-58.  He experiences anxiety attacks 4-5 times per week, involving shortness of breath, rapid heart rate, panic, fatigue, and confusion.  *Id.* at 1058.  He has nightmares 4 times per week.  *Id.* at 1060-61.  He withdraws several times a month to his room for a period of days at a time.  He has mood swings daily and thinks of about suicide on a daily basis but has no intent.  *Id.* at 1061-62.

Plaintiff is on various psychotropic medications in addition to medication for his dizzy spells.  He believes the medication is helping.  *Id.* at 1054.  His medication "calms" his dizzy spells down, but he still gets them "on a regular basis."  *Id.*  The day before the hearing, he fainted while in the shower.  *Id.* at 1054-55.  He had also fainted a few days earlier.  *Id.* at 1059.

Plaintiff's additional health problems include "lots of pain" in his neck and lower back, along with problems with his hands and wrist.  *Id.* at 1056.

During a typical day, Plaintiff helps get his brother's children ready for school in the morning.  Two times a week after school, he supervises the children for an hour.  *Id.* at 1055, 1059.  He is not their primary caregiver.  *Id*. at 1058-59.  He washes his own laundry.  *Id.* at 1055.  He has difficulty cleaning because the physical stress causes rapid

heart rate and weakness, especially when he bends over. *Id.* at 1055-56. He has one friend who he visits but not very often. *Id.* at 1056. In the past, he liked to hunt and fish, but he has lost interest in his hobbies. *Id.*

C. **Medical Evidence**

One central opinion at issue on remand was provided by Plaintiff's primary care physician, Dr. Martin. His earliest treatment record indicates that he was seen for a check-up in December 2003 when he was experiencing vertigo and balance disturbance. (Doc. #6, *PageID*# 681). Dr. Martin treated Plaintiff over 40 times for his various impairments from December 2003 through October 2010. *Id*. at 1123.

In March 2009, Dr. Martin completed a basic medical form. He noted that Plaintiff's medical conditions included bipolar depression, high blood pressure, generalized anxiety, vertigo, syncopal episodes, and hyperlipidemia. *Id*. at 769. He noted that Plaintiff's health status was deteriorating and he had no medication since August 2008. *Id*. Dr. Martin opined that Plaintiff could lift and/or carry no more than 50 pounds occasionally or 10 pounds frequently, sit no more than 2 hours at a time for a total of 2.5 hours in an 8-hour workday, and stand and/or walk no more than 1 to 2 hours at a time for a total of 2.5 hours in an 8-hour workday. *Id.* at 770. Dr. Martin believed that Plaintiff would be moderately limited in his ability to push, pull, bend, and see ("with vertigo"). *Id.* Dr. Martin concluded that Plaintiff was unemployable and would be for 12 months or more. *Id.*

6

Dr. Martin also completed a mental functional capacity assessment in March 2009. He opined that Plaintiff was markedly limited in his abilities to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 767. Again, Dr. Martin concluded that Plaintiff was unemployable and would remain so for 12 months or more. *Id.*

In October 2010, Dr. Martin wrote a letter explaining:

> [Plaintiff] has been extensively physically evaluated by his primary care physician, cardiology, neu[r]ology, and the syncope clinic, etc. (Head and neck CT, MRI, EEG, holter monitor, nystagmography, tilt testing, lumbar puncture, audiometry) as well as mentally evaluated and treated (Beck Depression Inventory, Mood Disorder questionnaire, and other continuing psychiatric testing and therapy) both locally and through the Cleveland Clinic Foundation medically and TCN Behavioral Health in Xenia and other psychiatric facilities for years.

*Id.* at 868. Dr. Martin identified some of Plaintiff's working diagnoses to include syncopal episodes, recurrent, progressive, and unpredictable; headaches, migraine and tension types; vertigo and disequalibrium; bipolar depression, severe; generalized anxiety disorder with panic episodes; hypertension; and sinus tachycardia  *Id.* at 869. His prognosis was fair at best. And Dr. Martin opined:

> With the chronicity, unpredictability, severity and progression of his physical and mental impairments, it is my opinion, within the realm of medical probability, that Mr. Stephan Hall is permanently and totally disabled from performing all forms of substantial gainful employment.

*Id*.

Plaintiff's treating psychiatrist since 2011, Dr. Gainer opined (in October 2014) that Plaintiff's treatment/symptoms would cause him to be absent more than 3 times per month. *Id*. at 1705-08.

In November 2016, Plaintiff's cardiologist/electrophysiologist, Dr. Grubb, wrote a letter, stating:

> Stephen Hall suffers from a form of autonomic dysfunction and orthostatic intolerance consisting of the postural  tachycardia  syndrome (POTS) as well as Neurocardiogenic-Syncope (NCS). In patients with the postural tachycardia  syndrome, they appear to have a mild form of peripheral autonomic neuropathy.  In this form, the peripheral vasculature, especially the venous system, cannot maintain vascular resistance in the face of gravitational stress.  This results in a much greater than normal amount of blood pooling in the more dependent areas of the body such as the legs, the arms, and the splenic vasculature.  There is a tremendous sequestration of blood away from the central vasculature, which produces the compensatory increase in heart rate and mild heart contractility.  This increased heart rate and contractility may first compensate for a given degree of peripheral venous pooling, but over time the amount of pooling may increase and exceed the compensatory effect.

(Doc. #7, *PageID*#s 1744).  Dr. Grubb continued to generally discuss POTS and listed its many possible symptoms, including, for example, orthostatic intolerance, dizziness, fainting, syncope in the upright and sitting positions, tachycardia, generalized weakness, mood swings, anxiety, migraines, forgetfulness, and inability to concentrate.  *Id*. at 1744-45.  Dr. Grubb then wrote, "As you can tell by the constellation of symptoms, this indeed can interfere with a rigorous work/academic environment, as well as inhibit positive quality of life.  Even sitting can cause symptoms.  As you may understand, this condition

8

can make it very difficult to maintain gainful employment." *Id*. at 1745

 In November 2014, Dr. Smith examined Plaintiff for the Ohio Bureau of Disability Determination.  (Doc. #7, *PageID*#s 1747-59).  Dr. Smith recognized that Plaintiff underwent a tilt-table test in August 2014 that showed "1) Significant systemic hypertension; 2) Position-induced sinus tachycardia, potentially concerning for underlying autonomic dysfunction or postural orthostatic tachycardia syndrome ...." *Id*. at 1748.  Dr. Smith also reported, "X-ray of his lumbar spine at Kettering Hospital on September 26, 2014 showed multilevel degenerative disease with scarring at L2-3, L3-4, and L1-2; slight retrolisthesis at L3-4 measuring 6 mm and at L2-4 measuring 3mm.  He has multiple disc compressions from T12 to L5-S1." *Id*.

In his summary, Dr. Smith wrote that Plaintiff has "a history of a closed head injury with an injury to his middle ear with subsequent dizzy spells, loss of balance, and intermittent tinnitus." *Id*. at 1749.  Dr. Smith further noted that Plaintiff is able to drive and has chronic neck pain, but he uses a TENS unit he to control his neck pain.  Dr. Smith concluded that based on his objective findings on physical examination, Plaintiff is capable of lifting, carrying, pushing, or pulling up to 50 pounds; sitting, standing, and walking 15 minutes every 2 hours due to his neck and lower back issues. *Id.* at 1749.

In January 2015, at the ALJ's request, Dr. Macklin reviewed the record, completed a medical source statement, and answered interrogatories about Plaintiff's mental work abilities. *Id.* at 1762-70; *see* Doc. #9, *PageID*# 1778.  Dr. Macklin opined that as of 2007,

Plaintiff met listing 12.04 (affective disorders) of the Commissioner's Listing of Impairments.  *See* Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  Dr. Macklin also wrote that Plaintiff had been unable to work since 2003, due to POTS.  *Id.* at 1768.

Further detailed description of the medical records and opinions is unnecessary because the undersigned has reviewed the entire administrative record and because ALJ Lombardo, ALJ Statum, Plaintiff's counsel, and the Commissioner have accurately summarized the record.

## III.   <u>"Disability" Defined and the ALJ's Decision</u>

To be eligible for Disability Insurance Benefits or Supplemental Security Income, a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both types of benefits.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See id*.

ALJ Statum evaluated Plaintiff's applications and the evidence of record under the 5-step sequential evaluation mandated by Social Security regulation.  *See* 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4);[3] *see also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  She reached findings favorable to Plaintiff at steps 1 and 2, then proceeded to step 3 where she concluded that Plaintiff did not have an impairment or combination of impairment that constituted a disability under the Commissioner's Listing of Impairments.  *See* Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Continuing to step 4, ALJ Statum assessed Plaintiff's residual functional capacity—or, the most he could do in a work setting despite his impairments, *see* 20 C.F.R. § 416.945(a); *see also* Social Security Ruling 96-8p, 1996 WL 374184 (July 2, 1996), and concluded that Plaintiff could perform light work "except that he can perform frequent but not constant climb ramps or stairs; occasionally kneel, crouch, crawl, and stoop; with no climbing of ladders, ropes, or scaffolds."  (Doc. #7, *PageID#* 1017).  The ALJ also concluded:

> He is further limited to the performance of work that is low stress in nature or work that is unskilled, simple, and repetitive with no assembly line production quotas and no fast pace work.  The work must also involve minimal (meaning no more than occasional) contact with coworkers, supervisors, and the public.  Finally, the work must not involve exposure to heights, hazardous machinery, or commercial driving.

*Id*.  Given these findings, ALJ Statum concluded at step 4 that Plaintiff could not perform his past relevant work as a motor vehicle assembler.  *Id.* at 1032.

At step 5, the ALJ determined that Plaintiff could perform a significant number of

---

[3] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI Regulations.

unskilled, light exertional jobs that are available in the national economy. This, in the end, led her to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 1032-33.

## IV. <u>Judicial Review</u>

The Social Security Administration's determination of disability—here, embodied in ALJ Statum's decision—is subject to judicial review along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, substantial evidence supports the ALJ's factual findings when a "'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more

than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241; *see*

*Gentry*, 471 F3d at 722.

**V.    Discussion**

Plaintiff contends that ALJ Statum improperly rejected the opinions of his long-time treating physician Dr. Martin by finding his statements conclusory and unsupported by the clinical evidence.  (Doc. #9, *PageID*#s 1779-82).  Plaintiff reasons that the ALJ erred by substituting "her own opinion for the clinical findings in Dr. Martin's treatment notes, the frequency of seizures and sleep apnea, etc. "  *Id.* at *PageID*# 1779.  Plaintiff emphasizes that the ALJ failed to mention POTS—his primary impairment—and asserts that it is impossible to accurately analyze Dr. Martin's opinions without considering all of Plaintiff's impairments in combination.

The Commissioner argues that substantial evidence supports the ALJ's evaluation of Dr. Martin's opinions and her decision to place little weight on the opinions provided by Drs. Grubb, Macklin, and Ward.

Social Security regulations require ALJs to give the opinion of a treating physician controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 416.927(c)(2); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).  "Even if [a] treating physician's opinion is not given controlling weight, there remains a presumption, albeit a rebuttable one, that the

opinion…is entitled to great deference." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (internal quotations and citations omitted).  This rebuttable presumption requires ALJs to continue to weigh treating source opinions under certain factors, including the length of the treatment relationship, frequency of examination, specialization of the treating source, supportability of the opinion, and consistency of the opinion with the record as a whole.  20 C.F.R. §§ 416.927(c)(1)-(6); *see Bowen*, 478 F.3d at 747.  ALJs must likewise consider these factors to determine what weight to give the opinions provided by non-treating, consulting, and record-reviewing physicians.  *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836-37 (6th Cir. 2016).

ALJ Statum placed little weight on Dr. Martin's opinions.  She reasoned, "The objective and clinical evidence does not support his conclusory and markedly limiting restrictions, or his opinion of disability.  Specifically, clinical examinations have been unremarkable (Exhibits 49F at 4 and 12 [*PageID*#s 1394, 1402]) and his own treatment notes do not reveal observable clinical signs or findings consistent with the extent or frequency of the seizures he reported.... " (Doc. #6, *PageID*# 1029).  The fact that the ALJ cited only 2 pages from an 1,800-page administrative record in support of her observation about unremarkable clinical findings does not suggest a reasonable evidentiary basis for discounting Dr. Martin's opinions.  This is particularly so when Dr. Martin's was Plaintiff's very long-term treating physician—15 years—who had treated Plaintiff more than 40 times, as of early 2014.  *Id.* at 1123.  Such a lengthy treatment relationship with

such frequent treatment visits tend to breed a depth of knowledge about a patient that supports application of the treating physician rule. The regulations reflect this by explaining to social security applicants:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations....

20 C.F.R. § 404.1527(c)(2). And, rather than suggesting a reasonable view of Dr. Martin's opinion, ALJ Statum's citation to only 2 pages from an 1,800-page administrative record points toward an overly selective review of the record and reveals error. *See Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 904 (6th Cir. 2016) ("Substantial evidence review comes to this: Did the ALJ use 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'?" (citation omitted)); *see also Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) ("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *Minor v. Comm'r of Soc. Sec.*, 513 Fed Appx. 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis).

This problem in the ALJ's decision is compounded by her failure to evaluate Dr. Martin's opinions in light of Plaintiff's primary impairment—POTS (Doc. #7, *PageID#* 1029)—and in light of the effects caused by POTS combined with his other impairments. Dr. Martin explained in October 2010 that Plaintiff's disability status existed due to "the

15

chronicity, unpredictability, severity and progression of his physical and mental

impairments ....” (Doc. #6, *PageID#* 869).  Given this explanation by Dr. Martin, it was

not reasonable for the ALJ to find that his opinions were conclusory.  Dr. Martin’s

opinions were not only based on Plaintiff’s subjective complaints but also on his own

observations and training as a medical doctor.  *See id.* at 868-69.  Dr. Martin’s treatment

notes continually reflect his treatment for Plaintiff’s psychological and physical problems.

*Id.* at 386, 439, 477-550, 665-681, 886 , 897, 1291-1407, 1713-1743.  Over the years

he treated Plaintiff for the syncopal episodes, vertigo, and mental health issues.  *Id.*  A

close reading of Dr. Martin’s treatment notes also reflect a worsening of Mr. Hall’s dizzy

spells, headaches, and syncopal episodes.  *Id.* at 886-97.  Specifically, the treatment notes

of 10/26/09, 11/23/09, 05/06/10, 06/04/10, 08/10/10, and 09/08/10.  *Id.* at 888, 890-92,

894).  These treatment notes reflect complaints of passing out several times.  The notes

from the Cleveland Clinic confirm episodes of syncope or vertigo.  *Id.* at 337-62.  Dr.

Martin’s treatment notes in 2012 and 2013 continue to reflect that Plaintiff’s legs were

weak, he is unbalanced, has extreme fatigue, and still passing out.  On August 21, 2012, he

passed out 2 times while in the shower.  *Id.* at 1721, 1724, 1727, 1732.

    Dr. Martin’s opinions are supported by information in a letter written by Plaintiff’s

treating cardiologist/electrophysiologist Dr. Grubb.  *Id.* at 1744.  Dr. Grubb is “a leading

international and national expert in autonomic disorders...,” including POTS.  *Id.* at 1744.

Dr. Grubb confirmed that Plaintiff suffers from POTS “as well as Neurocardiogenic

Syncope." *Id*.  He then set forth a multitude of symptoms and a detailed description of what patients with these conditions experience.  Plaintiff's treatment records indicate that Plaintiff suffers from many of the POTS symptoms Dr. Grubb describes, and his conclusion that POTS "can make it very difficult to maintain gainful employment...," *id*. at 1745, tends to support Dr. Martin's opinions.  The ALJ gave Dr. Grubb's statements little weight because he discussed POTS patients generally and did not mention any objective findings or functional limitations specific to Plaintiff.  *Id*. at 1030.  The ALJ, however, overlooked or ignored the consistency between the general POTS information Dr. Grubb provided and Dr. Martin's opinions and Plaintiff's symptoms.  Although Dr. Grubb's information by itself does not establish that Plaintiff was under a disability, it does constitute evidence which the ALJ needed to consider when weighing Dr. Martin's opinions.  The ALJ's failure to do so was part and parcel of the error she made by not considering Dr. Martin's opinions in light of Plaintiff's POTS and other impairments combined.

The ALJ also placed little weight on Dr. Martin's opinions because he provided them at the request of Plaintiff's attorney.  This was an improper reason to discount Dr. Martin's opinions.  "The claimant bears the burden of submitting medical evidence establishing her [or his] impairments and ... residual functional capacity.  How else can [the claimant] cary this burden other than by asking her [or his] doctor to weigh in?" *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 20011).  Additionally, "[t]he [Commissioner]

17

may not assume that doctors routinely lie in order to help their patients collect disability benefits." *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1996). Indeed, a walk down this road would be analytically dangerous for the Commissioner as it would require the ALJ to apply less weight to all consultative physicians or medical advisors whose opinions were obtained by state agencies, by the Commissioner, or by Order of an ALJ. The Regulations do not contemplate this evidentiary situation. *See* 20 C.F.R. §§ 404.1527(b)-(e).

Next, the record contains numerous letters from friends and family members that corroborate the severity of Plaintiff's impairments. (Doc. #6, PageID 295-307). These letters specifically describe their observations of Plaintiff and his symptoms. *Id.* Although the letters are from lay witnesses, the regulations required the ALJ to consider them by promising claimants:

> We will also consider descriptions and observations of your limitations from you impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.

20 C.F.R. § 404.1545(a)(3). In addition, the letters contain many observations consistent with Dr. Martin's treatment notes and treatment notes from The Community Network. (Doc. #6, *PageID* #s 779-867, 886-95, 899-966).

Turning to the ALJ's rejection of the opinions provided by Dr. Macklin in January 2015, a further error arises. The ALJ sent interrogatories to Dr. Macklin who opined that Plaintiff met section 12.04 of the listings as of 2007 and was disabled as of 2003 based on POTS. (Doc. #7, *PageID*#s 1762-70). The ALJ placed little weight on Dr. Macklin's

18

opinion because it was not based on a treating or examining relationship and because the record does not support more than mild to moderate functional limitations concerning Plaintiff's mental health. *Id.* at 1030. Yet, the fact that the ALJ considered the lack of a treating or examining relationship here, where it supported her non-disability conclusion, but did not consider Dr. Martin's very long-term treatment relationship, where it would not have supported her non-disability conclusion, reveals error. As noted above, the "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza,* 219 F.3d at 393; *see Minor v. Comm'r of Soc. Sec.*, 513 Fed Appx. 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis). Plaintiff's medical records, moreover, contain a plethora of mental health treatment notes that support Dr. Macklin's opinion. And the ALJ overlooked or ignored Dr. Macklin's opinion that Plaintiff's POTS alone constituted a disability. Opinions provided by other mental-health professionals, namely Drs. Gainer and Ward and counselor Rothman, are consistent with Dr. Macklin's opinions. Treating psychiatrist Dr. Gainer believed that Plaintiff could not be dependable and reliable to the extent that he would be unable to maintain competitive employment, being absent more than 3 times per month. (Doc. #7, *PageID*#s 1705-08). Her opinion is supported by large number of mental-health treatment notes. Plaintiff began treatment at The Community Network (TCN) in July 2009. (Doc. #6, *PageID*#s at 779-862, 899-966, 973; Doc. #6, *PageID*#s 1709-12). He participated in both group and individual

19

counseling for his depression, anxiety, and anger issues.  *Id*.  His therapist, Randi

Rothman, MSS, LSW, helped him work on his coping skills, emotion regulation, distress

tolerance, interpersonal effectiveness, and mindfulness skills.  *Id*. at 973.  Dr. Ward

evaluated Plaintiff for the Bureau of Disability Determination in April 2009.  *Id*. at 444-48.

Dr. Ward diagnosed Plaintiff with Bipolar Disorder NOS and Anxiety Disorder.  *Id*. at

447.  He determined that Plaintiff's ability to withstand the stress and pressures associated

with day to day work activity would be markedly impaired by mental health difficulties.

*Id*. at 448.  He believed that Plaintiff was markedly impaired in his ability to maintain

attention, concentration, persistence, and pace.  Finally, he felt that Plaintiff's ability to

relate to fellow workers and supervisors was also markedly impaired.  *Id*.

     Accordingly, Plaintiff's Statement of Errors is well taken.

## VI.   <u>Remand is Warranted</u>

     Plaintiff seeks an Order reversing the ALJ's decision and remanding for benefits.

     Remand is warranted when the ALJ's decision is unsupported by substantial

evidence or when the ALJ failed to follow the Administration's own regulations and that

shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial

right.  *Bowen*, 478 F.3d at 746.  Remand for an ALJ's failure to follow the regulations

might arise, for example, when the ALJ failed to provide "good reasons" for rejecting a

treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider

certain evidence, such as a treating source's opinions, *see Bowen*, 478 F3d at 747-50;

failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff's credibility lacking, *Rogers*, 486 F.3d at 249.

Under sentence four of  42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits.  *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994).  The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking." *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994) (quoting *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

The record contains strong evidence in favor of finding Plaintiff to be under a disability, including, at a minimum, Dr. Martin's opinions combined with the information provided by Dr. Grubb, the opinions provided by Dr. Macklin, and Plaintiff's mental-health treatment records.  Contrary evidence is lacking.  There is no other treating or reliable examining physician opinion refuting Dr. Martin's opinion.  Dr. William Smith evaluated Plaintiff, but he provided an orthopedic exam and did not consider the extent of Plaintiff's POTS.  *See* Doc. #7, *PageID* #s 1747-59).  Dr. Martin has a longitudinal pers-pective of Plaintiff's impairments and limitations.  The opinions of physicians who did not

have the opportunity to review the entire medical evidence of record and have never seen

Plaintiff, especially compared to Dr. Martin's opinion, are lacking.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be vacated;

2.      Plaintiff Stephen Hall's applications for Disability Insurance Benefits and
        Supplemental Security Income filed on March 5, 2009 be REMANDED to
        the Social Security Administration for payment of benefits consistent with
        the Social Security Act; and

3.      The case be terminated on the docket of this Court.

July 25, 2016

                                    s/Sharon L. Ovington
                              Sharon L. Ovington
                        Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).

23